_____

PATTI A. PIDGEON,

                          Plaintiff                      DECISION AND ORDER

-vs-
                                                          15-CV-6578 CJS

COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.

_____

## APPEARANCES

For the Plaintiff:          Howard D. Olinsky, Esq.
                           Olinsky Law Group
                           300 South State Street, Suite 420
                           Syracuse, New York 13202

For the Defendant:         Elizabeth Rothstein, Esq.
                           Social Security Administration
                           Office of General Counsel
                           26 Federal Plaza, Room 3904
                           New York, New York 10278

                           Kathryn L. Smith, A.U.S.A.
                           Office of the United States Attorney
                           for the Western District of New York
                           100 State Street
                           Rochester, New York 14614

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Patti Pidgeon ("Plaintiff") for Social Security Disability

Insurance Benefits ("SSDI").  Now before the Court is Plaintiff's motion (Docket No.

[#10]) for judgment on the pleadings and Defendant's cross-motion [#12] for judgment

1

on the pleadings.  Plaintiff's application is denied, Defendant's application is granted, and this action is dismissed.

FACTUAL BACKGROUND

The reader is presumed to be familiar with the parties' submissions, which contain detailed recitations of the pertinent facts.  The Court has reviewed the administrative record [#9] and will reference it only as necessary to explain this Decision and Order.

Plaintiff was born in 1963 and completed both high school and four years of college. (193).  Plaintiff previously worked as a general manager of a restaurant, as a marketing developer for a non-profit organization, as a marketing coordinator for a manufacturer and as a marketing consultant for a radio station. (216).  In January 2009, Plaintiff was terminated from her radio-station position, which was described as involving "very high stress." (251).  This termination coincided with other stressors in Plaintiff's life, including the diagnosis of her son with bipolar disorder, the death of her sister-in-law and financial problems. (252, 257, 328).  Plaintiff, who had previously taken medication for depression, suffered a strong emotional reaction to being terminated, and was taken to the hospital by her husband, where she was diagnosed with "adjustment disorder and acute stress disorder." (252).[1]  Plaintiff claims that on the day she was fired, she was paranoid, "ha[d] hallucinations and . . . couldn't think straight" (9-11).  However, the contemporaneous medical notes indicate that she had a

_____

[1]At the hearing, Plaintiff's counsel stated, in connection with the termination of Plaintiff's employment, that she was "originally diagnosed with a psychotic disorder," citing Exhibit 2F, (11) however that  was incorrect, as Exhibit 2F pertained to an incident that occurred several months after Plaintiff was fired. *See, e.g.*, (255).

"sad mood," but appropriate affect, intact memory, normal intellectual functioning, good judgment and good insight. (252).

Approximately six months later, in July 2009, Plaintiff, who lives in Red Creek, New York, was hospitalized in Niagara Falls, New York, where she was visiting friends, after exhibiting "bizarre behavior" following a 2-day bout of drinking alcohol. (255, 328). Plaintiff claimed to have had racing thoughts, inability to sleep and preoccupation with finding a religion. (255). Upon examination, Plaintiff was paranoid, guarded, preoccupied and very labile, with an "inappropriate" affect involving "bursting into tears and then smiling." (255, 257). Plaintiff was treated with the antipsychotic drug "Geodon" and rapidly improved. (255). More specifically, after taking medication, Plaintiff was not labile or tearful, and was pleasant, appropriate, and in good control. (255). The discharge diagnosis was "Psychotic disorder NOS. Rule out bipolar disorder manic with psychotic feature." (255).

Plaintiff subsequently continued taking medication,[2] and eventually began therapy at Psychiatric Wellness Care, PLLC, where her therapist was Sherie Ramsgard, NP ("Ramsgard"). Plaintiff indicated, though that she found it difficult "being told that she need[ed] therapy along with her meds." (261).

At around this same time, Plaintiff started a new job as the box-office manager of a theater company. (11, 21-22). However, Plaintiff remained at that job only two months. (43). On March 18, 2011, Plaintiff told Ramsgard that she had lost her job two weeks earlier, "because she couldn't do the tasks that were asked" of her. (263).

_____

[2]*See, e.g.* (328-335).

Nevertheless, Plaintiff's mood was stable, she was less anxious, and she was eating and sleeping well. (263). Upon examination, Ramsgard found no evidence of a thought disorder, no delusions, no suicidal ideation, intact cognition, intact judgment and intact insight. (263).

On May 12, 2011, Ramsgard noted that Plaintiff was "contin[uing on her] current medication regime with good effects." (261). Plaintiff noted, for example, that she was sleeping well and had not had a manic episode "in over 2 years." (261). Plaintiff was upset though, indicating that while her "mood anxiety, energy, motivation, concentration and attention [were not] horrible, they [were] not where they used to be and she want[ed] to be like she used to be." (261-262).

On June 9, 2011, Plaintiff reported to Ramsgard that she "only had 4 bad days out of the month and [that her] anxiety [had] only lasted about 20 mins each time[, for which] she didn't even use the Xanax." (262). Plaintiff stated that she was considering going to Florida for four months "for a temporary job working with her niece." (262).

On June 28, 2011, Ramsgard noted: "Mood and anxiety even and manageable, sleeping well, not using Risperdal as she was just using it for sleep and is sleeping fine. Has not needed Xanax. Pt. continues to look for a job and that is [the] most stressful thing for her." (264).

On October 26, 2011, Bonnie Sperato, NP ("Sperato") reported, "mood been bad lately, depressed, anxiety, no irritability. [sic] Sleep not good lately, both falling and staying asleep." (265). Plaintiff also expressed worry about her family's finances. (265).

On December 1, 2011, Plaintiff's primary care physician Joh Eppolito, M.D. ("Eppolito") reported that Plaintiff's bipolar disorder was "stable on meds." (271).

On January 3, 2012, Plaintiff again met with Ramsgard, and "denie[d] depression or anxiety," but claimed to "still ha[d] ups and downs, but not as severe." (265). Plaintiff reported having some racing thoughts, but was sleeping well, and had good energy, attention and concentration. (265). Plaintiff indicated that she was looking for a job but having "no luck." (265).

On May 14, 2012, Plaintiff met with Ramsgard and reported having "a few bad days maybe 4 or 5, mostly anxiety, no mood swings, no depression." (266). Plaintiff noted that she had an upcoming job interview. (266).

On July 27, 2012, Ramsgard met with Plaintiff and reported: "She feels her mood is stable on current medications. . . . She is thinking of stopping her medications as she is doing well." (267-268). Ramsgard cautioned Plaintiff against stopping her medications. (268). Ramsgard noted that Plaintiff had obtained new health insurance, which was going to require her to switch a different care provider. (267-268).

On October 3, 2012, Eppolito noted that Plaintiff's bipolar disorder remained stable on medication, and that she had a normal affect, and was "attentive and able to concentrate." (278). Eppolito reported that he was referring Plaintiff to Cayuga Counseling for ongoing long-term treatment of her mental health symptoms. (279).

On January 23, 2013, and again on January 29, 2013, Plaintiff met with her new therapist, Lisa Clancy, LMSW ("Clancy"), at Cayuga Counseling Services, to provide information prior to the start of therapy. Plaintiff reportedly indicated that she "ha[d] a history of delusions," and described "two psychosis episodes." (298). Plaintiff further claimed that she "ha[d] symptoms of anxiety and [was] isolating herself due to fear of another psychosis episode." (298).

On February 19, 2013, Clancy reported that she had met with Plaintiff again, but did not note anything unusual about Plaintiff's behavior or demeanor. (296).

On February 21, 2013, Christina Caldwell, Ph.D. ("Caldwell") performed a one-time psychiatric evaluation of Plaintiff, at the Commissioner's request. (288-292). Plaintiff acknowledged that she was able to take care of herself and her home, including preparing food, cleaning, laundry and managing the household finances. (291).  However, Plaintiff reportedly told Caldwell that she had difficulty sleeping, involving difficulty falling asleep and then frequent awakening during the night; had panic attacks "three or four times a week"; and had difficulty concentrating. (289). Plaintiff further stated that she did not like to "go anywhere alone," and was "too anxious to grocery shop." (291).  However, upon examination, Caldwell found that Plaintiff was oriented, with coherent and goal-directed thoughts and no evidence of hallucinations, delusions or paranoia. (290).  Caldwell further reported that Plaintiff's attention, concentration and memory were intact, despite her claim to the contrary, and that her intellectual functioning was average. (290).  Caldwell indicated, though, that Plaintiff appeared dysthymic and anxious, with "fair to poor" insight and judgment. (290).  Caldwell also noted that Plaintiff seemed "very upset throughout the evaluation." (290).  Caldwell's medical source statement was as follows:

> The claimant is able to follow and understand simple directions and instructions.  She is limited in her ability to perform simple tasks independently.  She is able to maintain attention and concentration, maintain a regular schedule, and learn new tasks.  She is limited in her ability to perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress.  . . .  The claimant will be able to manage her own funds.

(291-292).

On October 10, 2013, Clancy reported that Plaintiff claimed to experience depression, tearfulness, hopelessness, negative thinking, low self esteem, worry and relationship issues. (367). Clancy indicated that Plaintiff seemed "tearful, reactive, anxious and sad." (369). In that regard, Clancy noted that Plaintiff reported "a high level of anxiety and panic attacks due to her current" living situation with particular family members, which were triggering "old traumas and experiences." (371). Plaintiff claimed to be irritable, sad, and worried, and to have difficulty sleeping and making decisions. (371).

On October 21, 2013, Plaintiff met with Eppolito to have him fill out "papers . . . for disability." (354). Plaintiff reported having anxiety, bipolar disorder, difficulty concentrating, depression, panic disorder, paranoia, racing thoughts and sleep disturbance. (354). Upon examination, Eppolito noted that Plaintiff appeared to be in no acute distress, and further stated: "Displays comfort and cooperation during encounter. Affect is normal. Attentive and able to concentrate." (355). Also on October 21, 2013, Clancy reported that Plaintiff seemed "talkative, anxious and happier." (366).

On November 18, 2013, Clancy reported that Plaintiff appeared "talkative, tearful, anxious and sad." (364).

On February 10, 2014, Clancy filled out a Mental Residual Functional Capacity Assessment form for Plaintiff. (362-365). Although, at the administrative hearing held on March 24, 2014, Plaintiff indicated that she was no longer seeing Clancy for therapy. (19). Accordingly, it appears that Clancy's treatment relationship with Plaintiff lasted

approximately one year, or slightly less. In any event, Clancy indicated that Plaintiff would be either "moderately limited" or "markedly limited" in almost every single one of the twenty categories set forth on the form. (362-365). The only exception was in regard to the "ability to perform activities within a schedule," in which Clancy indicated that Plaintiff was "not significantly limited." (362). More specifically, Clancy stated that Plaintiff would be "moderately limited" with regard to remembering work locations and procedures, understanding and remembering short and simple instructions, understanding and remembering detailed instructions, carrying out detailed instructions, interacting with the public, asking simple questions or requesting assistance, getting along with co-workers, maintaining socially-appropriate behavior, responding to changes in the workplace, being aware of normal hazards, traveling to unfamiliar places and setting realistic goals. (362-365). Clancy further stated that Plaintiff would be "markedly limited" with regard to maintaining attention and concentration for extended periods, sustaining an ordinary routine without supervision, working with others, making simple work-related decisions, completing a normal workday or workweek without interruptions from mental health symptoms, and accepting direction and criticism from supervisors. (362-363).

PROCEDURAL BACKGROUND

On September 14, 2012, Plaintiff applied for SSDI benefits, claiming a disability onset date of January 23, 2009. In connection with that application, the Commissioner had Plaintiff examind by Dr. Caldwell, as noted earlier. The Commissioner denied Plaintiff's claim initially, in part based upon a Mental Residual Functional Capacity Assessment performed by non-examining, non-treating psychologist T. Inman-Dundon,

Ph.D. ("Inman-Dundon"). (66-68). In making that assessment, Inman-Dundon had access to Plaintiff's treatment records and Dr. Caldwell's consultative report. (61-63).

Inman-Dundon opined that there was no evidence of Plaintiff being limited in her ability to carry out "very short and simple instructions," and that Plaintiff was "not significantly limited" in being able to carry out detailed instructions, sustaining an ordinary routine without supervision, making simple work-related decisions, and maintaining socially-appropriate behavior. (66). Inman-Dundon opined, though, that Plaintiff was "moderately limited" in maintaining attention and concentration for extended periods, performing activities within a schedule, being punctual, interacting appropriately with the public, accepting criticism and instruction from supervisors, getting along with coworkers, responding to changes in the workplace, setting realistic goals and plans independently of others, completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number of rest periods. (66-67). Nevertheless, Inman-Dundon opined that despite these moderate limitations Plaintiff "would be able to work in a low-stress work environment, not working closely with others." (68).

On March 24, 2014, a hearing was held before an Administrative Law Judge ("ALJ"). (5-27). Plaintiff indicated, *inter alia*, that she was primarily unable to work due to her mental impairments. For example, Plaintiff acknowledged that her physical impairments mainly only prevented her from "bending down," due to knee pain, and from lifting more than twenty-five pounds. (19). With regard to mental impairments, Plaintiff stated that she could not return to work because she was "very anxious" and

9

"depressed," had "panic attacks," and "c[ould]n't sleep," all of the time. (11-12). When asked if she could concentrate so as to read a book or finish a television program, Plaintiff answered, "Sometimes. Sometimes I can't." (16). When asked to be more specific, Plaintiff indicated that she was unable to finish those tasks "probably 50 percent of the time." (16). Plaintiff indicated that her two-month work attempt as a box-office manager failed because she couldn't concentrate or focus on the computer tasks she was given. However, Plaintiff also indicated that when she was not working she spent part of her time performing internet searches for family members. (21-22). Plaintiff also stated that she kept track of the family's finances, including making and scheduling online payments. (22). During the hearing the ALJ took testimony from a vocational expert ("VE"), which is discussed further below. (23-26).

On July 3, 2014, the ALJ issued her decision, denying Plaintiff's application for benefits. (41-53). Applying the familiar five-step sequential analysis used to evaluate disability claims, the ALJ found, at step one, that Plaintiff had not engaged in substantial gainful activity since January 23, 2009. (43). At step two, the ALJ found that Plaintiff has the following severe impairments: "degenerative disc disease, degenerative joint disease, bipolar disorder, adjustment disorder and anxiety." (43). The ALJ also found that Plaintiff's asthma was a non-severe impairment. (43).

At step three of the analysis, the ALJ found that none of Plaintiff's impairments met or medically-equaled the severity of a listed impairment. (44-46). With regard to Plaintiff's mental impairments, the ALJ noted that to meet a listed impairment, Plaintiff would have to demonstrate "marked" difficulties in at least two of four areas, one of which was the ability to "maintain concentration, persistence or pace." The ALJ found

that Plaintiff did not exhibit marked difficulties in any of the four areas, and stated, in pertinent part:

> [Claimant's] activities indicate no greater than moderate limitations to [her] concentration, persistence or pace. These moderate limitations are reflected within the residual functional capacity finding, which limits the claimant to simple, routine, and repetitive tasks and low-stress work, defined as requiring only occasional decisionmaking.

(45). The ALJ noted, however, that her findings at step 3 were "not a residual functional capacity assessment." (46).

Prior to reaching step four of the analysis, the ALJ found that Plaintiff had the following residual functional capacity:

> [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except occasional kneel; [sic] able to perform simple, routine, repetitive tasks; able to work in a low-stress job, defined as having only occasional decisionmaking required; [sic] no interaction with the public; and only occasional, superficial interaction with coworkers and supervisors.

(46). The ALJ indicated that in making that assessment, she had considered the medical evidence and opinion evidence in accordance with the Commissioner's regulations. (46).

In discussing the medical opinion evidence concerning mental impairments, the ALJ gave limited weight to aspects of the opinions of Clancy and Caldwell, and great weight to the opinion of Inman-Dundon. (50-51). The ALJ stated that she gave little weight to Caldwell's consultative opinion that Plaintiff was "limited in her ability to perform simple tasks independently" because it was vague and unsupported by the examination findings. (51). The ALJ stated that such opinion was vague because it did

not quantify or explain the term "limited." (51). The ALJ further stated that such opinion was contrary to the record evidence, which showed that Plaintiff "demonstrated normal behavior, speech, thought, cognition, orientation, attention, and concentration, despite some problems with mood and affect" throughout the relevant period. (51). The ALJ emphasized that such evidence did "not support a finding that [Plaintiff] is limited in her ability to perform simple tasks independently." (51). However, the ALJ evidently credited most of the other aspects of Caldwell's opinion, such as her opinion that Plaintiff had limitations relating with people and dealing with stress, since she included corresponding limitations in the RFC. (46).

The ALJ also indicated that she gave little weight to the portion of Clancy's opinion which indicated that Plaintiff had "marked" limitations in various areas, because it was inconsistent with Plaintiff's "demonstrations at the consultative examination," was unsupported by Clancy's treatment notes, and contradicted "the overall weight of the evidence." (50). The ALJ stated, for example, that Clancy's opinion that Plaintiff had "marked" limitations in her ability to maintain attention and concentration was inconsistent with numerous findings in the record that Plaintiff had normal attention and concentration. (48-50).

The ALJ indicated that she gave great weight to Inman-Dundon's opinion that Plaintiff "had no greater than moderate mental limitations and was capable of working in a low-stress environment, not working closely with others." (51). The ALJ indicated that Inman-Dundon's opinion was consistent with the evidence of record, stating:

> Dr. Inman-Dundon's opinion that the claimant can perform work with
> limited social contact and stress levels is supported by the medical record,

which indicates that the claimant had normal behavior, speech, thought, cognition, orientation, attention, and concentration, despite some problems with mood, affect, socialization, insight and judgment.

(51). However, the ALJ went even further than Inman-Dundon, by limiting Plaintiff to "simple, routine, repetitive tasks," to further limit Plaintiff's stress. (51).

The ALJ found that Plaintiff's claims about the severity of her symptoms were not entirely credible in various respects. (47-51). For example, the ALJ emphasized that although Plaintiff claimed to have "diminished memory and concentration," (47), and problems with "attention," (48), repeated examinations by both treating- and non-treating sources had found that her attention and concentration were "intact." (49). Further, when summarizing "the medical record pertaining to [Plaintiff's] mental functioning," the ALJ found that despite problems with her "mood and affect," she "regularly exhibited normal behavior, speech, thought, cognition, orientation, attention and concentration." (49). The ALJ therefore concluded that Plaintiff's complaints to be not entirely credible, stating:

Based on the claimant's demonstrations of intact thought, behavior, cognition, attention, and concentration throughout the period, and considering her alleged difficulties with concentration and attention, I find that she is capable of simple, routine, repetitive tasks. . . . [T]he claimant's allegations are found to lack credibility based upon their inconsistency with the objective medical record. For instance, the record does not support her allegations that she . . . has significantly [sic] mental limitations. On the contrary, the record indicates . . . [that she has] intact behavior, speech, thought, cognition, orientation, attention and concentration, despite problems with mood, affect, socialization, insight, and judgment.

(50); *see also, id.* ("[T]he overall weight of the evidence . . . indicates that [Plaintiff] had

13

normal behavior, speech, though, cognition, orientation, attention, and concentration, despite some problems with mood and affect."); (51) (Reiterating, in summary, that neither the "medical evidence" nor Plaintiff's "daily activities" corroborated Plaintiff's allegations).

At step four of the sequential analysis, the ALJ found that Plaintiff was unable to perform her past relevant work, based in part on the VE's testimony to that effect. (51-52).

However, at the fifth and final step, the ALJ found, based upon the VE's responses to hypothetical questions, that Plaintiff could perform other work that exists in significant numbers in the national economy. (52-53). In particular, the ALJ asked the VE to consider

> [a]n individual of the same age, education and work experience as the claimant . . . able to perform work at a light exertional level as defined by the regulations, [able to] occasional[ly] kneel, able to perform simple, routine and repetitive tasks, able to work in a low-stress job defined as having only occasional decision-making required, no interaction with the public, only occasional superficial interaction with coworkers and supervisors.

(24). The VE stated that such a person could perform the jobs of "photocopy machine operator," "tagger" and "weight recorder," all of which are categorized as both light and unskilled. (53). Consequently, the ALJ concluded that Plaintiff was not disabled at any relevant time.

Plaintiff appealed, but the Appeals Council declined to review the ALJ's determination.

On September 25, 2015, Plaintiff commenced this action. On May 20, 2016,

Plaintiff filed the subject motion [#10] for judgment on the pleadings; on July 18, 2016,

Defendant filed the subject cross-motion [#12] for the same relief; and on August 8,

2016, Plaintiff filed a reply [#13].

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the

Commissioner of Social security as to any fact, if supported by substantial evidence,

shall be conclusive." The issue to be determined by this Court is whether the

Commissioner's conclusions "are supported by substantial evidence in the record as a

whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496,

501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It

means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Id.* If the Commissioner applies the correct standards and the

decision is supported by substantial evidence, "the Commissioner's decision must be

upheld, even where substantial evidence may support the plaintiff's position and despite

that the Court's independent analysis of the evidence may differ from the Secretary's."

*Alves v. Colvin*, No. 13-CV-3898 RPP, 2014 WL 4827886, at *5 (S.D.N.Y. Sept. 29,

2014) (citation omitted).

DISCUSSION

The ALJ's RFC Determination

Plaintiff broadly asserts that "[t]he residual functional capacity finding was the

product of legal error and was unsupported by substantial evidence."[3] However, this

---

[3]Pl. Memo of Law [#10-1] at p. 10.

portion of Plaintiff's brief actually makes several discrete arguments: That the ALJ did not adequately account for Plaintiff's moderate deficits in concentration, persistence and pace merely by limiting her to performing "simple, routine, repetitive tasks"; that the ALJ's finding that Plaintiff's "thought, attention, and concentration" were "intact" is unsupported by substantial evidence; and finally, that the ALJ interpreted Inman-Dundon's report "inconsistently," by giving it "great weight," yet not expressly incorporating all of the "moderate limitations" identified therein into the RFC finding.

The Court finds that Plaintiff's arguments lack merit. In that regard, to the extent Plaintiff contends that the ALJ was required to expressly include the moderate limitations (in concentration, persistence and pace) identified at Step 3 in the RFC determination,[4] such argument lacks merit because the ALJ's findings at step 3 of the sequential analysis are not an RFC determination.[5] *See, Whipple v. Astrue*, 479 F.App'x 367, 369, 2012 WL 1522005 at *1 (2d Cir. May 2, 2012) (Explaining that the factors for evaluating the severity of a mental impairment at the third step are not to be applied when determining the claimant's RFC). Nor is it necessarily error for an ALJ not to include findings made at Step 3 in the RFC. *See, McIntyre v. Colvin*, 758 F.3d 146, 150-151 (2d Cir. 2014) ("*McIntyre*") (Rejecting claimant's argument that ALJ's decision was internally inconsistent because findings made at Step 3 were not included in

---

[4]Pl. Memo of Law [#10-1] at p. 12.

[5]Indeed, with regard to "concentration, persistence or pace," the issue before the ALJ at step three of the analysis was only whether Plaintiff had "marked" difficulties in those areas, and the ALJ answered that question in the negative, finding that Plaintiff had "no greater than moderate limitations." (45).

RFC).[6]  Rather, "Step Four findings need only afford an adequate basis for meaningful judicial review, apply the proper legal standards, and be supported by substantial evidence such that additional analysis would be unnecessary or superfluous." *McIntyre v. Colvin*, 758 F.3d  at 150 (citation and internal quotation marks omitted).

Here, the ALJ's RFC determination meets those requirements.  As shown by the discussion above, the ALJ conducted a thorough examination of the evidence and concluded that Plaintiff's moderate impairments do not prevent her from performing light work, subject to the specified modifications.[7]  The finding is supported by substantial evidence, including the opinion of Inman-Dundon, who indicated that Plaintiff is able to work notwithstanding her moderate impairments, provided that she is in a "low-stress work environment, not working closely with others." (68).[8]  The RFC finding also largely tracks Dr. Caldwell's opinion, except for her statement regarding Plaintiff's ability to perform simple tasks independently, discussed further below. (291).

---

[6]Although Plaintiff cites this Court's decision in *Thompson v. Astrue*, No. 10-CV-6576 CJS, 2012 WL 2175781 (W.D.N.Y. May 30, 2012) to argue that any limitations as to concentration, persistence or pace must be expressly included in the RFC, at least one other Judge in this District has explained that to the extent such a rule existed at the time *Thompson* was issued, it no longer applies after *McIntyre*. *See, Figgins v. Berryhill*, 2017 WL 1184341 at *12, n. 2 (W.D.N.Y. Mar. 29, 2017) ("It is important to note here that before *McIntyre*, courts appeared to *require* explicit discussion concentration, persistence, and pace in the RFC and in the questions asked of the VE, without exception. *See Thompson v. Astrue*, No. 10-CV-6576 CJS, 2012 WL 2175781, at *13 (W.D.N.Y. May 30, 2012) (Siragusa, J.)") (emphasis added; other citation omitted).

[7]"[O]ccasional kneel[ing] . . . simple, routine repetitive tasks . . . low stress . . . defined as [requiring] only occasional decisionmaking . . . no interaction with the public . . . only occasional interaction with coworkers and supervisors."

[8]In this regard, Dr. Inman-Dundon's opinion was actually less-restrictive than the RFC finding, in that Inman-Dundon did not limit Plaintiff to performing simple work.  In an apparent abundance of caution, the ALJ went even further, and limited Plaintiff to "simple, routine, repetitive tasks," in order to "further limited the stress of any potential job." (51).

17

Plaintiff nevertheless contends that the ALJ's determination in this regard, and particularly her determination that "Plaintiff demonstrated intact thought, attention, and concentration," is unsupported by substantial evidence. However, the Court strongly disagrees, based upon the evidence of record mentioned earlier, consisting of repeated findings, by multiple examiners, that Plaintiff's attention and concentration remained intact despite fluctuations in her mood. Indeed, Plaintiff's care providers consistently found that her overall mental functioning, including her attention and concentration, was intact, even when she subjectively claimed otherwise.

Plaintiff alternatively contends that the ALJ committed reversible error by failing to expressly incorporate the aforementioned "moderate limitations" (found at Step 3) into the hypothetical questions posed to the VE. In that regard, Plaintiff maintains that an ALJ is not permitted to "account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work,"[9] because such limitations do not adequately compensate for a claimant's ability to persevere and remain on task. For this proposition, however, Plaintiff's supporting memo of law [#10-1] primarily cites authority from other circuits, while ignoring *McIntyre*.[10]

In *McIntyre*, the Second Circuit held that an ALJ's failure to explicitly include non-exertional limitations in hypothetical questions to a VE, while erroneous, may not require reversal. In particular, the Court stated:

---

[9]Pl. Memo of Law [#10-1] at p. 11 (quoting an opinion from the Fourth Circuit).

[10]Plaintiff's reply brief [#13] cites *McIntyre*.

The hypothetical presented to the vocational expert . . . closely tracked the ALJ's residual functional capacity assessment made at Step Four of the analysis, which, as the Commissioner concedes, failed to mention explicitly McIntyre's non-exertional limitations. The hypothetical added, however, a limitation to "simple, routine, low stress tasks."

We have not specifically decided whether an ALJ's hypothetical question to a vocational expert must account for limitations in concentration, persistence, and pace. But our case law is plain that the combined effect of a claimant's impairments must be considered in determining disability; the Commissioner must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe. Accordingly, an ALJ's hypothetical should explicitly incorporate any limitations in concentration, persistence, and pace.

We hold, however, that an ALJ's failure to incorporate non-exertional limitations in a hypothetical (that is otherwise supported by evidence in the record) is harmless error if (1) medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, and the challenged hypothetical is limited to include only unskilled work; or (2) the hypothetical otherwise implicitly accounted for a claimant's limitations in concentration, persistence, and pace.

[S]ubstantial evidence in the record demonstrates that McIntyre can engage in "simple, routine, low stress tasks," notwithstanding her physical limitations and her limitations in concentration, persistence, and pace. By explicitly limiting the hypothetical to such tasks (after fully explaining McIntyre's physical restrictions), the ALJ sufficiently accounted for the combined effect of McIntyre's impairments.  The ALJ's error therefore was harmless.

*McIntyre v. Colvin*, 758 F.3d at 151–52 (citations and internal quotation marks omitted).

In the instant case, the Court similarly finds that any error in the ALJ's

hypothetical question to the VE -- committed by describing Plaintiff as being able to

perform "simple, routine and repetitive tasks," rather explicitly describing her "moderate limitations" in concentration, persistence or pace -- was harmless under *McIntyre*'s harmless-error test. More specifically, there is substantial medical evidence, such as Inman-Dundon's report, indicating that Plaintiff can engage in simple, routine tasks and/or unskilled work despite her limitations in concentration, persistence, and pace. (64-68).[11] Moreover, the hypothetical question implicitly inquired about only unskilled jobs, by asking about "simple, routine and repetitive tasks," and the only jobs identified by the VE were unskilled. The Court therefore finds, pursuant to *McIntyre*, that any error was harmless.

Plaintiff nevertheless contends that the ALJ's treatment of Inman-Dundon's opinion was inconsistent, because she purportedly gave the opinion great weight, but did not expressly incorporate all of the moderate limitations (in concentration, persistence or pace) that Inman-Dundon identified into the RFC finding or into questions posed to the VE. Plaintiff reiterates that the ALJ improperly "reduced" those opinions by limiting Plaintiff to "simple, routine, repetitive tasks."[12] However, this is just a variation of Plaintiff's previous argument, and lacks merit for the same reasons.

<u>The ALJ's Treatment of Dr. Caldwell's Report</u>

Plaintiff next contends that the ALJ "selectively relied" on Caldwell's report, while failing to ask Caldwell to explain the parts of her report that were vague. In particular,

---

[11]Again, Inman-Dundon actually indicated that despite Plaintiff's moderate limitations, she could work at jobs that were low-stress and did not involve working closely with others, even if they were not "simple, routine and repetitive." The ALJ's addition of the terms "simple, routine and repetitive" benefitted Plaintiff by further reducing the occupational base. Nevertheless, even with those additional limitations, the VE identified jobs that Plaintiff could perform.

[12]Pl. Memo of Law [#10-1] at p. 14.

Plaintiff contends that the ALJ erroneously discounted as "vague" that portion of Caldwell's report, which indicated that Plaintiff was "limited in her ability to perform simple tasks independently." (51). Plaintiff maintains that the ALJ should have sought clarification from Caldwell as to what she meant by "limited."[13]

Plaintiff's argument on this point lacks merit. Plaintiff contends that the ALJ "selectively relied upon" Caldwell's opinion, except for the portion indicating that Plaintiff was limited in her ability to perform simple tasks independently. However, this is just another way of indicating that the ALJ's RFC finding is almost entirely consistent with Caldwell's opinion. Indeed, as already discussed, Caldwell opined that Plaintiff could follow and understand simple directions and instructions, maintain attention and concentration, maintain a regular schedule, learn new tasks, and manage her own funds. (291-292). Thus, the "inconsistent treatment" consists of the fact that the ALJ rejected a single sentence from Caldwell's report: "She is limited in her ability to perform simple tasks independently." (291).

On this point, the Court does not agree that the ALJ was required to re-contact Caldwell before giving little weight to that single opinion. The ALJ gave two reasons for affording "little weight" to that opinion: First, because it was vague; and second, because it was not supported by the overall record. Both observations are supported by substantial evidence. Caldwell's statement that Plaintiff is "limited" in performing simple tasks independently is, in fact, vague, because it does not quantify the limitation. However, that fact is somewhat irrelevant, because even if Caldwell had quantified her

---

[13]Defendant responds that the ALJ had no duty to develop the record, since there were no obvious gaps in the record.

opinion, the ALJ went on to indicate that Caldwell's own report, and, more importantly, the overall record, fail to indicate that Plaintiff is limited in her ability to perform simple tasks independently (51). As the ALJ correctly observed, apart from finding that Plaintiff had "problems with mood, affect, insight, judgment and social skills," Caldwell's examination was largely unremarkable, as Plaintiff "demonstrated normal behavior, speech, thought, cognition, orientation, attention and concentration." (51). Moreover, Caldwell's report acknowledged that Plaintiff performed a large number of simple tasks independently each day. (290-291). The ALJ continued by noting that, according to the overall record, "throughout the period, the claimant demonstrated normal behavior, speech, thought, cognition, orientation, and concentration, despite some problems with mood and affect. (Ex. 1F-4F, 8F, 10F, 11F)." (51). Accordingly, the ALJ's observation, that the record contradicts Caldwell's opinion that Plaintiff would be limited in performing simple tasks independently, is supported by substantial evidence.[14]

Plaintiff attempts to argue otherwise by asserting that "[*a*]*ll* of the evidence in this case points to serious limitations in [Plaintiff's concentration, persistence and pace] and [her] ability to engage in simple tasks."[15] However, the Court disagrees for the reasons already discussed. Namely, there is substantial evidence that Plaintiff can work on a sustained basis despite her moderate nonexertional impairments.

In sum, the Court does not agree with Plaintiff that the ALJ was required to seek clarification from Caldwell before assigning "little weight" to her opinion that Plaintiff is

---

[14]The evidence of record indicating that Plaintiff is able to perform simple tasks independently is so voluminous, and the evidence to the contrary so lacking, that the Court wonders whether Caldwell's statement in that regard was a drafting error.

[15]Pl. Memo of Law [#10-1] at p. 17 (emphasis added).

limited in performing simple tasks independently.

<u>The ALJ's Credibility Determination</u>

Plaintiff next contends that the ALJ's credibility determination was erroneous and unsupported by substantial evidence. For example, Plaintiff contends that the ALJ failed to support her finding, that medications "improved her mental functioning," with citations to the record.[16] Indeed, Plaintiff suggests that her mental functioning did not "improve" while on medication.[17] Plaintiff further indicates that the ALJ failed to consider that her medications "affect[ed her] ability to concentrate, persist or maintain a consistent pace throughout a workday."[18] Additionally, Plaintiff maintains that the ALJ "failed to consider the corroborating opinion evidence regarding [her] subjective complaints of psychological symptoms."[19]

However, the Court disagrees with all of those assertions. To begin with, Plaintiff's suggestion that her condition did not improve with medication is clearly refuted by the record. Rather, the record indicates that medication greatly improved, but did not entirely eliminate, her symptoms. Indeed, as noted above, in July 2012, Plaintiff indicated that she wanted to stop taking her medications because she was "doing [so] well." (267-268). The ALJ therefore accurately noted that Plaintiff's condition improved with medication. *See, e.g.*, (50) ("Despite ongoing symptoms related to her mental impairments, such as mood fluctuations, the medical record indicates that

---

[16]Pl. Memo of Law [#10-1] at p. 18.

[17]Pl. Memo of Law [#10-1] at p. 18-19.

[18]Pl. Memo of Law [#10-1] at p. 19.

[19]Pl. Memo of Law [#10-1] at p. 19.

her condition improved and stabilized with medication.").

Further, Plaintiff's assertion that her medications negatively affected her concentration, persistence or pace (and that the ALJ failed to consider such fact), is unsupported by the record. At the very least, there is substantial evidence that Plaintiff did not experience side-effects from her medications. For example, on October 26, 2011, Ramsgard noted that Plaintiff was not experiencing side effects from her medications. (340) ("Pt. notes she is stable on current meds, no SE [side effects] or complaints."); *see also*, (261) ("Pt. continues on current medication regiment with good effects, denies any noted side effects[.]").

Nor does the Court agree that the ALJ failed to consider "corroborating opinion evidence" when assessing Plaintiff's credibility. Rather, the ALJ's decision indicates that she carefully considered all of the opinion evidence, and her conclusions regarding the weight to be assigned to those opinions are supported by substantial evidence.

CONCLUSION

Plaintiff's application [#10] for judgment on the pleadings is denied, Defendant's cross-motion [#15] is granted, and this action is dismissed.

So Ordered.

Dated: Rochester, New York　　　　　ENTER:
　　　　October 18, 2017

　　　　　　　　　　　　　　　　　/s/ Charles J. Siragusa
　　　　　　　　　　　　　　　　　CHARLES J. SIRAGUSA
　　　　　　　　　　　　　　　　　United States District Judge